UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAMIE ELWARD,

Plaintiff,

v.

SEALY, INC.,

Defendant.

CASE NO. C22-5645 BHS

ORDER

THIS MATTER is before the Court on plaintiff Jamie Elward's motion for attorneys' fees, Dkt. 116, and on defendant Sealy Inc.'s renewed motion for judgment as a matter of law, or for a new trial, amendment of the judgment, or remittitur, Dkt. 132.

Elward prevailed on her *quid pro quo* and her hostile work environment WLAD claims against Sealy. The jury rejected Sealy's *Faragher-Ellerth* affirmative defense to her hostile work environment claim. It awarded Elward $5 million. Dkt. 114.

Sealy renews its "halftime" Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law, asking the Court to enter judgment in its favor on both of Elward's claims. First, it argues, there is no evidence supporting Elward's *quid pro quo* WLAD claim. It repeats its summary judgment argument that Elward's supervisor, Perez,

did not have the authority to bring Elward on the “supervisor’s trip” because Elward was not a supervisor, and that Elward knew that to be the case. Dkt. 132 at 4–7. It points out that the only evidence Elward provided about an exchange of sex for a promotion came in an improper and confusing exchange at the end of her re-direct examination:

> **Q (McGavick)**: Did Perez offer you a promotion for supervisor conference if you would have sex with him?
>
> **A (Plaintiff)**: Correct.

Dkt. 132 at 5 (citing Dkt. 125 at 36:10-16).

Second, Sealy argues that the evidence established its *Faragher-Ellerth* affirmative defense as a matter of law. It argues it acted with reasonable care to prevent and correct any harassment; Elward read and agreed to comply with Sealy’s sexual harassment policy, and, even though she did not comply with the policy’s immediate reporting requirement, as soon as she did report Perez’s conduct, his employment ended and she never saw him again. Sealy argues that Elward unreasonably failed to report the harassment when it began, particularly given her trial testimony that she was particularly susceptible to profound harm from such conduct. Sealy seeks judgment as a matter of law on both of Elward’s claims under Rule 50(b). Dkt. 132 at 9.

Alternatively, Sealy seeks a new trial under Rule 59(a)(1)(A). It argues that the verdict in Elward’s favor was against the clear weight of the evidence, was based on demonstrably false testimony, and that a new trial is required to prevent a miscarriage of justice. Sealy’s motion is based partly on the sheer size of the verdict, but it also contends that Elward’s testimony that Perez offered her a promotion in exchange for sex was

demonstrably untrue. Sealy also argues that Elward's attorney improperly and repeatedly referred to its massive size and called it a mere "piece of paper" in a successful effort to inflame the jury's prejudice; he asserted without evidence that Sealy was protecting "profits, rather than people." Dkt. 132 at 12.

Sealy also emphasizes that most of the "garden variety" emotional distress damages Elward and her family testified about related to her childhood sex abuse by her stepfather, and that her counsel asked the jury to award damages to help her "become a whole person, I don't know if again or for the first time." Dkt. 132 at 14 (citing Dkt. 130 at 67). And it reiterates that it was denied any opportunity to conduct discovery into Elward's medical history and her claimed "susceptibility" to harm, because she asserted only a claim for "garden variety" emotional distress damages.

Sealy also argues that it is entitled to a new trial based on the Court's jury instructions. It argues that the jury should have decided whether Perez was Elward's manager, rather than being instructed that he was. It argues that the Court erred in failing to instruct the jury regarding Elward's improper editing and deleting the phone recordings she made of her interactions with Perez. It argues that the spoliation warranted an "adverse inference instruction," and that Elward is not entitled to a presumption of irrelevance. It argues that its own failure to preserve video surveillance footage was not comparable. Dkt. 132 at 17–18.

Finally, and most persuasively, Sealy argues that the jury's $5 million verdict was outrageous and excessive, and that it should be vacated or reduced.

The issues are addressed in turn.

**A. Sealy's Rule 50(b) motion for judgment as a matter of law is DENIED.**

Sealy's motion correctly articulates the Rule 50(b) standard:

> A renewed motion for judgment as a matter of law under Rule 50(b) may be granted when the evidence "permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013) (citation omitted); Fed. R. Civ. P. 50(a), (b). Though the Court draws all reasonable inferences in favor of the nonmoving party, it "considers all of the evidence in the record." *Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). It must also give credence to "evidence supporting the moving party that is uncontradicted and unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted). "[T]he mere existence of some alleged factual dispute between the parties or a 'scintilla of evidence' will not defeat a properly supported motion." *Elliott v. Versa CIC, L.P.*, 2019 WL 414499, at *5 (S.D. Cal. Feb. 1, 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

*See* Dkt. 132 at 3. Sealy argues it is entitled to judgment as a matter of law on each of Elward's WLAD claims.

**First**, it asserts there is no evidence supporting Elward's *quid pro quo* verdict because there is no evidence that Perez offered her a promotion in exchange for sex. Instead, the evidence is undisputed that Elward (1) knew the supervisor trip in question was only for supervisors, (2) never applied for any supervisor position (or any other promotion), and (3) knew that Perez did not have the authority to promote her or anyone else to a supervisor position.

It emphasizes that while the Ninth Circuit's remand identified a question of fact about Perez's authority to "get Elward on that trip," Dkt. 132 at 4 (citing Dkt. 69 at 2–3), her trial testimony was instead that on November 18 Perez offered to bring her "*if he got approval.*" *Id.* (citing Dkt. 124 at 122-24) (emphasis in original). It argues there was no

evidence at trial supporting a finding that he had or even implied that he had authority to bring her on the trip. Nor, it argues, was there any evidence that Elward knew about or applied for any promotion. It argues that Elward's cryptic re-direct testimony about a "promotion for supervisor conference" in exchange for sex was demonstrably false. *Id.* at 5.

Elward's response emphasizes that a *quid pro quo* verdict may be based on an "unwelcome sexual advance" tied to an "express or *implicit* promise of a change in work status or conditions." Dkt. 138 at 2 (citing Court's Jury Instructions, Dkt. 108) (emphasis added). Elward argues that the Ninth Circuit already determined that the trip was a benefit because it was for supervisors; a position to which she aspired, and that that determination is the law of the case. *Id*. She concedes that Perez's offer was conditioned on Coatney's approval, but argues that did not mean he could not get it if she agreed to go, and to have sex. *Id*. at 4. She argues she did not know that Coatney would not approve the trip until *after* she reported Perez's conduct to Sealy, on November 19. *Id*. at 5.

Sealy replies that the Ninth Circuit identified only a factual question; it did not and could not purport to make a factual finding. It reiterates the convoluted nature of her attorney's question and her "correct" answer, and that the evidence does not support a finding that Perez had the actual or apparent authority to offer her a supervisor trip, much less a promotion for which she never applied. Dkt. 140 at 3. It argues Elward confirmed that she did not believe that Perez was offering her a "next step" to promotion. *Id*. at 4 (citing Dkt. 125 at 40).

Indeed, Sealy argues that the jury found that Elward had failed to prove she suffered a tangible employment action, and that the same failure to promote is necessarily the same thing she had to prove in support of her *quid pro quo* claim. Thus, it asserts, the plaintiff's verdict and large damage award are the result of the jury's passion and prejudice, supporting a new trial or a remittitur. Dkt. 132 at 13–14.

This is a close question. But viewed in the light most favorable to Elward, Perez "dangled" a company trip for employees in the position to which Elward aspired, implicitly (at least) in exchange for sex on that trip. The fact Perez could not promote Elward does not mean that he did not offer an employment benefit for sex.

The Court does not agree that the jury's finding that Sealy did not take a tangible employment action against her (which would have deprived it of its *Faragher-Ellerth* affirmative defense) is inconsistent with its finding that Perez offered her an employment benefit in exchange for sex.

Sealy's renewed motion for judgment as a matter of law on Elward's *quid pro quo* WLAD claim is **DENIED**.

**Second**, Sealy argues that it has prevailed on its *Faragher-Ellerth* affirmative defense as a matter of law. The Ninth Circuit reversed this Court's dismissal on summary judgment, holding that the reasonableness of its efforts to prevent sexually harassing behavior and of Elward's delay in reporting Perez's conduct was a factual question for the jury. Sealy now fairly contends that Elward's delay was even more unreasonable, because of her claimed "susceptibility" to harm from unwanted sexual advances, based on her undisclosed and unexplored history of sexual abuse as a child.

This is a good argument, but the Ninth Circuit already held that the reasonableness of Elward's delay was a question for the jury. The jury considered and rejected Sealy's affirmative defense, and the Court cannot determine as a matter of law that Elward unreasonably failed to take advantage of Sealy's preventative and corrective opportunities.

Sealy's motion for judgment as a matter of law on its *Faragher-Ellerth* affirmative defense is **DENIED**.

**B. Sealy's Rule 59 motion for a new trial is DENIED.**

As an alternative to judgment as a matter of law, Sealy seeks a new trial, for several reasons.

After a jury trial, a court may grant a new trial for any reason for which a new trial has previously been granted in an action in federal court. Fed. R. Civ. P. 59(a)(1)(A). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). "Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

Sealy's argument that Elward falsely testified about the promotion is discussed and rejected above. The motion for a new trial based on Elward's testimony is **DENIED**.

Sealy admitted in its answer that Perez was a manager, and it concedes that he had the ability to control her hours and thus her pay. Its motion for a new trial based on the “manager” jury instruction on this issue is **DENIED**.

Sealy also renews its spoliation argument, arguing that the Ninth Circuit already held that altering or deleting parts of the recordings she made of her interactions with Perez was “improper.” It argues Elward is not entitled to a presumption that the lost material was irrelevant, and that the Court erred in denying its requested spoliation instruction. It also argues the Court erred in equating its own failure to preserve security camera footage of the incidents.

The flaw in these arguments is that Sealy did not dispute what Perez said or did to Elward. Her in-court testimony about what he did was unchallenged, Sealy believed her at the time, and the recordings she did offer were almost unintelligible. There is no evidence, no reasonable inference, and no claim that Perez did not actually say what Elward testified he said. There is no evidence Elward invited or welcomed it. Perez may have been able to support such a claim, had he testified. But he did not. The Court does not agree that the missing audio recordings or the lack of a spoliation instruction made the trial or the result unfair to Sealy. Its motion for a new trial on this basis is **DENIED**.

Sealy also argues that counsel inflamed the jury’s passion and prejudice in two ways, warranting a new trial or at least a substantial reduction in the verdict. First, it argues that counsel improperly (and in violation of the Court’s ruling in limine) repeatedly referenced that Sealy was a large, wealthy corporation—merely a “piece of paper,” more concerned with profits than its human employees. There was literally no

evidence supporting the latter accusation, and the invitation to punish Sealy because it could afford a large verdict was plainly improper.

Second, and most glaringly, Elward and her family testified at length about her particular susceptibility to emotional harm from unwanted sexual advances, even verbal ones, because of her childhood history of sexual abuse. Her counsel unambiguously implored the jury to compensate her for *all* the trauma she had suffered in her life, not just that caused by Perez's three days of sexual harassment:

> And there's, sadly, no prognosis she has that this will all be better in a little bit. The first 20 years of her life, 16, however many, trauma. Once again, susceptible. The purpose of damages is to make a person whole. Again, no formula to do that, but she has suffered a tremendous injury[.]
>
> ***
>
> The right thing is to break this cycle with an award of damages that can help Jamie go forward and become a whole person -- I don't know if again or for the first time.

Dkt. 130 at 69–70.

The Court cannot conclude that these issues influenced the liability verdict, but it is firmly convinced that they and the testimony and argument discussed below unfairly influenced the size of the verdict, and that the verdict is grossly excessive on the evidence.

A jury's damage award will be upheld unless the amount is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). A court has discretion to grant a new trial where a verdict appears to be against the weight of the evidence, and that discretion "includes overturning verdicts for excessiveness and

ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996). In considering a motion for remittitur, the trial court must view the evidence concerning damages in a light most favorable to the prevailing party. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001).

The Court agrees with Sealy that the $5 million verdict in this case is not supported by the evidence.

As an initial matter, Elward sought only "garden variety" emotional distress damages, and successfully claimed that by doing so she did not waive her physician–patient privilege. She thus denied Sealy the right to conduct any discovery into what sorts of emotional harm she had suffered, or into her history of sexual abuse. She then—in *closing*[1]—asserted that she had a particular "susceptibility" to harm from even verbal unwanted sexual remarks and actions, based on her medical history of sexual abuse by her stepfather.

A claim that verbal sexual harassment "lit up" Elward's previously undisclosed "susceptibility" to extreme harm because of a tragic history is flatly inconsistent with a claim for garden variety emotional distress damages. It is instead a claim that, because of her specific and tragic circumstances, the conduct at issue caused Elward "profound" harm:

---

[1] The Court instructed counsel to avoid using the term of art "susceptibility," but he continued to use it throughout his closing. Dkt. 130 at 67 *et seq*.

> Sealy's problem was solved when Alfredo left. Jamie's problem was just ignited. It was stirred up. She had a susceptibility to sexually-inappropriate things negatively impacting her life in profound ways[.]

Dkt. 130 at 67.

"Garden variety" emotional distress is "ordinary or commonplace emotional distress." *Carrig v. Kellogg USA Inc.*, No. C12-837RSM, 2013 WL 392715, at *2 (W.D. Wash. Jan. 30, 2013) (quoting *Ruhlmann v. Ulster Cnty. Dep't of Soc. Servs.*, 194 F.R.D. 445, 449 n.6 (N.D.N.Y. 2000)). Elward's invocation of the privilege to preclude discovery into her medical history is a matter of federal, not state law. *See Equal Opportunity Emp. Comm'n v. Roy Farms, Inc.*, No. 12-CV-3117-TOR, 2014 WL 12788722, at *5 (E.D. Wash. Feb. 11, 2014). In *Roy Farms*, Judge Rice explained that a plaintiff seeking garden variety emotional distress damages—distress that is "simple or usual"—does not waive the privilege:

> Garden variety claims refer to claims for compensation for nothing more than the distress that any healthy, well adjusted person would likely feel as a result of being so victimized; claims for serious distress refer to claims for the inducement or aggravation of a diagnosable dysfunction or equivalent injury.

*Id*. (citing *E.E.O.C. v. Nichols Gas & Oil, Inc.*, 256 F.R.D. 114, 121 (W.D. N.Y. 2009)).

Elward cannot have it both ways: claim only "usual" emotional distress, and deny Sealy any opportunity to explore her history, and then claim at trial that due to her particular, unusual, and harrowing circumstance, she suffered *un*usually severe and profound emotional distress. Sealy should have been permitted to explore the circumstances surrounding these far-more-than-garden-variety emotional distress damages, or Elward must be precluded from seeking and obtaining them.

It is readily apparent to the Court that the jury not only compensated Elward for her particular susceptibility, but also for its underlying cause. It is clear the jury did what counsel asked it to do, and sought to make Elward "whole," perhaps for the first time in her life. It did so because Sealy could afford to pay it, and because counsel asked it to punish Sealy for caring more about profits than people. The size of the jury's verdict demonstrates that it was the product of passion and prejudice.

The Court's immediate reaction to the verdict was sadness. Rarely has a verdict been so far from what the Court expected. Rarer still is the Court's firm conviction that a verdict must be dramatically reduced to prevent an overt miscarriage of justice. The verdict shocked the Court's judicial conscience, and it has no hesitation in concluding that it is grossly excessive.

The Court agrees with Sealy that it can only be liable for the emotional distress it caused Elward; not the damage caused by her stepfather, and not the damage suffered by her family. *See* Dkt. 132 at 21. Elward conceded that even before she worked at Sealy she did not trust her husband to be alone with her daughters. *Id*. at 23. That is not garden-variety emotional distress damage, and it was not caused by Perez or Sealy as a matter of law.

The evidence that Perez said repulsive things to Elward is undisputed, and the jury's liability verdict is defensible. Its damage award is not.

A trial court granting a motion for remittitur does not substitute its judgment for the jury's; it reduces the judgment to the maximum amount sustainable by the proof. *Id.* The jury's award for noneconomic damages "must be in proportion to the injury

suffered" and supported by competent evidence. *Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 140 (1993). The Court will consider a new award if the verdict "is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice." *Bunch v. King Cnty. Dep't of Youth Servs.*, 155 Wn.2d 165, 179, 182 (2005) (quoting *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835 (1985)). An award that is "flagrantly outrageous and extravagant," even considering the court's deference to the jury's verdict, supports remittitur. *Id.* at 179.

Sealy argues that the evidence supports an award of at most, $250,000. Dkt. 132 at 20. Elward correctly contends that this number is a "guess," and suggests that it highlights the difficulty in arriving at a non-economic damage award, which is why the Court defers to the jury. Dkt. 138 at 31. She argues that Washington law does not require a comparison of the jury's verdict to verdicts in similar cases. *Id*. at 22, 30. But there is no other way to empirically ascertain whether the verdict "is so excessive (or inadequate) to unmistakably indicate the amount must have been the result of passion or prejudice." *See id*. at 22 (citing RCW 4.76.030).

This Court denied a similar motion in a case arising from the Amtrak derailment near DuPont. Amtrak admitted liability and the jury awarded a young woman with a traumatic brain injury more than $6,000,000. Amtrak sought a remittitur, and the Court denied the motion even though it conceded the verdict was "high." *See Steele v. Amtrak*, No. 19-5553 BHS, Dkts. 83 and 126. The Court also recently presided over a jury trial about a much older supervisor's years-long inappropriate sexual harassment (including

unwanted sexual physical contact) of a young female track coach. The jury awarded $250,000, reduced slightly by the plaintiff's failure to mitigate. *See Larson v. Quillayute Valley School District*, No. 24-5716 BHS, Dkt. 244. The Court's "conscience" is necessarily rooted in its experience in similar cases. Elward's case is much more like *Larson* than it is *Steele*.

The Court does not minimize Elward's history of abuse, but it cannot ignore that she chose to subject herself to Perez's additional harassment for three additional days in the hope of proving what he was doing, even though she now claims that such verbal harassment was profoundly harmful to her. It cannot ignore the evidence that her contemporaneous texts and conduct undermined her claim of severe and profound emotional distress. Elward instead testified she could have "let it go" had Perez stopped harassing her after the first day (November 17, 2021), and on the second day she "jokingly" texted a co-worker that Perez "was going to be fucking fired or blackmailed if he did not stop." *See* Dkt. 132 at 19–20 (citing Dkt. 124 at 11–12, and 174–175, Exhibit A-22).

Nor does the evidence support the conclusion that Sealy's conduct *after* Perez resigned support her claim that Sealy itself harmed her. She emphasizes that Sealy did not complete its investigation following Perez's resignation, and still does not tell potential employers about his harassment. But the evidence is undisputed that Holliday immediately believed her account when Elward finally told her about it on Friday, and Perez left the building and never returned. Elward's claim that the failure to investigate further, and to tell future potential employers about Perez's conduct caused her profound

emotional distress. But there is no basis for Sealy "tying a can to Perez's tail, " and it remains unclear what additional facts an investigation would have unearthed, or to what end.

Sealy believed Elward, and its claim that Perez would have been fired had he not resigned was unchallenged. It is not disputed that Sealy put him on its "do not hire" list. Whatever a post-resignation investigation disclosed would not have prevented what had already occurred, and Sealy's conduct after Elward reported Perez's conduct was not a separate claim and is not separately actionable. The evidence does not support Elward's current claim that the lack of further investigation or some further punishment of Perez even after his resignation was a cause of severe emotional distress.

Sealy's alternative motion for a remittitur is **GRANTED**. The Court will order a remittitur to **$1.250 million**, the very high end of what the Court concludes the evidence supports in this case, viewed in the light most favorable to Elward. If Elward does not accept the remittitur, the Court will order a new trial. She should inform the Court of her election **within 21 days**.

**C. Elward is entitled to reasonable attorneys' fees.**

Elward prevailed and is entitled to a reasonable attorneys' fee under the WLAD. RCW 49.60.030(2). She seeks a total of 2448.1 hours at hourly rates ranging from $710 for Asa Garber to $910 for Hugh McGavick, the lead attorney with most of the hours. Together the attorneys seek a lodestar fee of $2,005,451. Dkt. 153 at 2. They also seek a ten, twenty-five, or fifty percent "multiplier," based on the risky and contingent nature of

the undertaking. Dkt. 116 at 2; *see also* Garber Decl., Dkt. 117 at 8–13. The latter calculation totals $3,008,176.50. Dkt. 153. Elward also seeks $21,779.18 in costs. *Id*.

**1. Attorneys' Fee Standard**

The first step in determining a reasonable attorney's fee is to calculate the "lodestar." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551–52 (2010); *Scott Fetzer v. Weeks*, 114 Wn.2d 109 (1990); *Absher Constr. v. Kent Sch. Dist. No. 415*, 79 Wn. App. 841, 847 (1995).

The Ninth Circuit recently reiterated that, to determine the lodestar, courts calculate the prevailing market rate in the relevant community and then multiply it by the number of hours reasonably expended on the case. *United States ex rel. Thrower v. Academy Mortgage Corporation*, 172 F.4th 703, 707 (2026) (citing *Perdue,* 559 U.S. at 551 (simplified), and *Edmo v. Corizon, Inc.*, 97 F.4th 1165, 1168 (9th Cir. 2024)). The benefit of the lodestar method is that it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Id.* (citing *Perdue*, 559 U.S. at 552).

The Court should exclude overstaffed, redundant, or unnecessary time. *Hensley*, 461 U.S. at 434. The Court must also consider the extent of Plaintiffs' success, as that is a "crucial factor" in determining an appropriate award. *Id.* at 440; *Blair v. Wash. State Univ.*, 108 Wn.2d 558, 570 (1987).

**2. Reasonable hourly rate.**

The Court determines reasonable hourly rates by looking to the "prevailing market rates in the relevant community." *Bell v. Clackamas County*, 341 F.3d 858, 868 (9th Cir.

2003). This usually involves an evaluation of the hourly rates of comparable attorneys in the forum district. *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992). The Court should also consider the experience, skill, and reputation of the attorney requesting fees. *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995).

Sealy argues that the requested rates are excessive and that employment lawyers in Tacoma with counsel's experience are able to and do charge $650 or less per hour. Dkt. 135. It argues that McGavick and Garber are equating their rates to those of partners in large, often national firms in downtown Seattle across all practice areas, not employment litigation. *Id*. at 5. It contends its own attorneys charged far less in this case, and that McGavick concedes he recently was awarded $650 per hour in Thurston County. *Id*. (citing Dkt. 118-5).

The Court has reviewed the Declarations in support of the fee request, including the Wooster Declaration and the attached article. Dkt. 120. Even Wooster does not support the conclusion that an experienced employment litigation attorney in Tacoma charges $910 per hour; Wooster bills at $800.

The Court has not awarded a $910 hourly rate in a comparable case for comparable work. It acknowledges that, like everything else, rates are increasing. But it agrees that a reduction in the rates awarded is warranted. The Court will award McGavick $700 and Garber $550 per hour.

**3. Reasonable number of hours.**

The second step of the lodestar calculation involves another exercise of the Court's informed discretion: the number of hours "reasonably expended" on the

litigation. "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

With that in mind, however, in determining the reasonable number of hours, the Court must exclude those hours that are excessive, redundant, or otherwise unnecessary. *Hensley*, 461 U.S. at 434; *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007). This factor requires a review of billing records and an informed estimate of how much any given task might reasonably take. The Court also considers the opposition's review of the prevailing party's attorneys' timekeeping records, and its own observations throughout the litigation.

The Court notes at the outset that more experienced attorneys are able to charge higher reasonable rates because they have honed their skills and judgment; they are wiser and generally more efficient.

Attorney McGavick's billing records are exceedingly difficult to decipher. He uses a shorthand code that includes a sort of "key," but the Court cannot review hundreds of hours of billing entries and evaluate what was done or why. *See* Dkt. 118-6.

Sealy argues that "at least" 350 of the claimed hours are excessive; they reflect work that was not productive or that was caused by Elward's destruction of some of her recordings of Perez. Sealy also contends that Elward's attorneys spent 325 hours more on the case than did Sealy's attorneys. Dkt. 135 at 5.

The Court notes that McGavick has spent 90 additional hours on this case since he filed his post-judgment fee application in March, and Garber has spent an additional 186 hours. *Compare* Dkts. 116 and 153. That is 276 attorney hours—ten hours a day for almost six full working weeks—spent on responding to Sealy's Rule 50 motion, Dkts. 138, 141, and in litigating whether Sealy's power point presentation should be made part of the record, Dkts. 142, 145. That does not seem reasonable, or efficient.

In his 2005 *Frunz* case, McGavick spent less than 300 hours obtaining a jury verdict against various Tacoma police officers. *See* Dkt. 118-2. The Court understands that rates have increased in the intervening two decades, but the time spent litigating a four-day jury trial should not increase at an even faster rate.

Garber's hours include significant time travelling (by airplane) at his hourly rate. While some travel is reasonable, the Court agrees it is not reasonable to charge hourly for commuting by plane to the case. The Court will reduce Garber's hours by a similar amount.

The Court will reduce McGavick's hours from 1336.5 to 1100. It will reduce Garber's from 1111.6 to 900.

The Court's reasonable fee award is therefore:

| Attorney | Rate | Hours | Total |
|---|---|---|---|
| McGavick | $700 | 1100 | $770,000 |
| Garber | $550 | 900 | 495,000 |
| | | 2000 | 1,265,000 |

**4. Further adjustments are not warranted.**

Because the lodestar calculation is comprehensive, any enhancements to it are "rare and exceptional." *Perdue*, 559 U.S. at 554 (simplified); A multiplier may be awarded only upon "specific evidence" that the lodestar fee is "unreasonably low or unreasonably high." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (simplified); *see Thrower*, 172 F.4th at 709–711. Departures from the lodestar rate are to be "rare" and apply only when "the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue*, 559 U.S. at 554. Indeed, reliance on factors . . . subsumed in the lodestar determination is an abuse of the trial court's discretion. *Parsons v. Ryan*, 949 F.3d 443, 467 (9th Cir. 2020); *Thrower*, 172 F.4th at 709.

The contingent nature of the undertaking is generally subsumed in the lodestar, and a court may not adjust a reasonable fee based on a contingent fee agreement. *See VanGerwen v. Guarantee Mt. Life Co*., 214 F.3d 1041, 1048 (9th Cir. 2000).

These reasonable hourly rates already reflect the contingent nature of the undertaking, and the Court will not adjust the fees further by applying a multiplier.

The Court will award **$18,000** in costs.

A judgment in federal court earns interest at the federal rate, not the significantly higher state rate. 28 U.S.C. § 1961. For a verdict entered February 20, 2026, that rate is 3.50%.

The fee award will not change if Elward accepts the remittitur. It will be vacated if she elects a new trial, and can be revisited after such a new trial, if necessary.

**IT IS SO ORDERED**.

Dated this 27th day of August, 2026.

BENJAMIN H. SETTLE
United States District Judge